**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| METLAKATLA INDIAN COMMUNITY, a Federally Recognized Indian Tribe, | No. 21-35185 |
| | D.C. No. 5:20-cv-00008-JWS |
| *Plaintiff-Appellant,* | |
| | ORDER AND AMENDED OPINION |
| v. | |
| MICHAEL J. DUNLEAVY, Governor of the State of Alaska; DOUG VINCENT-LANG, Commissioner of the Alaska Department of Fish and Game; AMANDA PRICE, Commissioner of the Alaska Department of Public Safety, | |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the District of Alaska
John W. Sedwick, District Judge, Presiding

Argued and Submitted December 6, 2021
Pasadena, California

Filed September 8, 2022
Amended January 31, 2023

Before: William A. Fletcher, Johnnie B. Rawlinson, and
John B. Owens, Circuit Judges.

Order;
Opinion by Judge W. Fletcher

## SUMMARY[*]

### Indian Law

The panel filed (1) an order amending its opinion, denying a petition for panel rehearing, and denying, on behalf of the court, a petition for rehearing en banc; and (2) an amended opinion reversing the district court's dismissal, for failure to state a claim, of the Metlakatlan Indian Community's suit against Alaskan officials, claiming that an 1891 statute granted the Community and its members the right to fish in the off-reservation waters where they had traditionally fished, and that they therefore were not subject to an Alaska statute's limited entry program for commercial fishing in waters designated as Districts 1 and 2.

The 1891 Act established the Annette Islands Reserve as the Community's reservation. The panel held that the 1891 Act also granted to the Community and its members a

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

non-exclusive right to fish in the off-reservation waters where they had traditionally fished. The panel applied the Indian canon of construction, which required it to construe the 1891 Act liberally in favor of the Community and to infer rights that supported the purpose of the reservation. In *Alaska Pac. Fisheries v. United States*, 248 U.S. 78 (1918), the Supreme Court inferred a fishing right from the 1891 Act. At issue was the scope of that right. The panel concluded that a central purpose of the reservation, understood in light of the history of the Community, was that the Metlakatlans would continue to support themselves by fishing. The panel therefore held that the 1891 Act preserved for the Community and its members an implied right to non-exclusive off-reservation fishing for personal consumption and ceremonial purposes, as well as for commercial purposes.

The panel reversed the decision of the district court and remanded to allow further proceedings to determine whether the Community's traditional off-reservation fishing grounds included the waters within Alaska's Districts 1 and 2.

---

## COUNSEL

Julie A. Weis (argued), Christopher G. Lundberg, and Christopher T. Griffith, Haglund Kelley LLP, Portland, Oregon, for Plaintiff-Appellant.

Laura E. Wolff (argued) and Christopher F. Orman, Assistant Attorneys General; Treg R. Taylor, Attorney General, Office of the Alaska Attorney General, Anchorage, Alaska; for Defendants-Appellees.

## ORDER

The opinion filed on September 8, 2022, and published at 48 F.4th 963, is hereby amended and replaced by the amended opinion filed concurrently with this order.

With this amendment, Judges W. Fletcher, Rawlinson, and Owens have voted to deny the petition for panel rehearing. Judges Rawlinson and Owens have voted to deny the petition for rehearing en banc, and Judge W. Fletcher so recommends.

The full court has been advised of the petition, and no judge of the court has requested a vote on the petition for rehearing en banc. Fed. R. App. P. 35.

Appellees' petition for panel and en banc rehearing (Dkt. No. 40) is **DENIED**. No further petitions for rehearing or rehearing en banc will be entertained.

## OPINION

W. FLETCHER, Circuit Judge:

Since time immemorial, members of the Metlakatlan Indian Community ("the Community") and their Tsimshian ancestors have inhabited the coast of the Pacific Northwest and fished in its waters. In 1887, at the invitation of President Grover Cleveland, the Community relocated from British Columbia, Canada, to the Annette Islands in what was then the United States Territory of Alaska. In 1891, Congress passed a statute (the "1891 Act") recognizing the Community and establishing the Annette Islands Reserve as its reservation.

In 1916, President Woodrow Wilson proclaimed that the Metlakatlans' reservation extends 3,000 feet from the shoreline of the Annette Islands, and that the Metlakatlans have an exclusive right to fish within the reservation boundaries (the "Proclamation"). After the Proclamation, the Metlakatlans continued to fish, as they always had, both in the waters immediately surrounding the islands and in waters far from the islands' shores. In subsequent years, courts, federal agencies, and the Territory of Alaska acknowledged with approval that the Metlakatlans fished in their traditional off-reservation waters.

In 1972, Alaska amended its constitution to authorize the State to restrict the entry of new participants into commercial fisheries in state waters. Pursuant to the amendment, Alaska enacted a statute creating a limited entry program for commercial fishing. In 2020, in response to Alaska's attempt to subject the Metlakatlans to its limited entry program, the Community sued Alaskan officials in federal district court. The Community contended that the 1891 Act grants to the Community and its members the right to fish in the off-reservation waters where Community members have traditionally fished. The district court disagreed, holding that the Act provides no such right.

We reverse. We hold that the 1891 Act grants to the Community and its members a non-exclusive right to fish in the off-reservation waters where they have traditionally fished.

## I.  Historical Background

Community members are descendants of the Tsimshian people indigenous to the Pacific Northwest. Tsimshian fishermen long followed the fish runs along the coast and in

the rivers of what is now British Columbia, establishing temporary villages to obtain fish for subsistence, use in cultural practices, and trade.   Marjorie M. Halpin & Margaret Seguin, *Tsimshian Peoples: Southern Tsimshian, Coast Tsimshian, Nishga, and Gitksan*, *in* 7 *Handbook of North American Indians* 267, 268–71, 281 (Wayne Suttles & William Sturtevant eds., 1990).   Historical sources indicate that they fished as far north as 50 miles from the Annette Islands in what is now the State of Alaska.

In 1862, a group of Tsimshians joined a lay Anglican missionary, "Father Duncan," in establishing a coastal community at Metlakatla, British Columbia.  *See* Andrew Martindale et al., *Bending but Unbroken: The Nine Tribes of the Northern Tsimshian Through the Colonial Era*, *in Power, Political Economy, and Historical Landscapes of the Modern World* 251, 270 (Christopher R. DeCorse ed., 2019); Halpin & Seguin, *supra*, at 281.   The name Metlakatla—a Tsimshian word that means "place beside calm water"—reflects a relationship with rivers and the sea that, for Tsimshian peoples, centers on fishing as the "bedrock of the Tsimshian culture and way of life." Professor Brian Hosmer observed:

> [Tsimshian cultural stories] reveal[] a great deal about the way Tsimshians understand their world.   Away from human beings, salmon live as people, in villages, with chiefs, organizing their lives around the annual runs, which appeared to them as cottonwood leaves.   It is only when the humans and salmon are in contact that salmon "people" take on their familiar form. Their relationship is reciprocal.   Salmon

> runs would continue only so long as humans
> remain faithful to rituals . . .

Brian C. Hosmer, *American Indians in the Marketplace: Persistence and Innovation Among the Menominees and Metlakatlans, 1870-1920* 115 (1999).

The Tsimshians who gathered at Metlakatla began a communal commercial fishing enterprise. *Id.* at 149. In 1884, the Community established a fish cannery. The cannery turned out 8,300 cases of canned fish in its first year of operation. *Id.* at 183.

In the 1880s, Canada began to impose a reserve system throughout Tsimshian territory, dividing tribal land into allotments to be distributed to individual tribal families. Martindale, *supra*, at 274. In 1883 and 1884, Canada placed Metlakatla under the ambit of its Indian Act and appointed an agent to oversee community affairs. Hosmer, *supra*, at 191. At the same time, non-Indian fishermen and canneries began to compete with the Metlakatlans. *See id.* at 193. Before the Canadian provincial court, the Metlakatlans advocated for recognition of their aboriginal territorial rights and their attendant resource rights. *See id.* at 198; Peter Murray, *The Devil and Mr. Duncan: A History of the Two Metlakatlas* 184–87 (1985). After the provincial Supreme Court denied the Metlakatlans such recognition, Metlakatla's tribal council authorized Father Duncan to travel to Washington, D.C., to attempt to secure land for the Metlakatlans in the Territory of Alaska. Hosmer, *supra*, at 198; Murray, *supra*, at 190.

In March 1887, a group of five Metlakatlans traveled to the Territory of Alaska in search of a new home. Susan Neylan, *"Choose Your Flag": Perspectives on the*

*Tsimshian Migration from Metlakatla, British Columbia, to New Metlakatla, Alaska, 1887*, *in New Histories for Old: Changing Perspectives on Canada's Native Pasts* 196, 198 (Theodore Binnema & Susan Neylan eds., 2007). The group chose the nearby Annette Islands because of the islands' easy access to waters with abundant fish. *Alaska Pac. Fisheries v. United States*, 248 U.S. 78, 88 (1918) ("[The Metlakatlans] looked upon the islands as a suitable location . . . because the fishery adjacent to the shore would afford a primary means of subsistence and a promising opportunity for industrial and commercial development."); Neylan, *supra*, at 211; Brief for Appellant at 11, *Metlakatla Indian Cmty.*, *Annette Islands Rsrv. v. Egan*, 363 U.S. 555 (1960) (No. 326) ("[The Metlakatlans] specifically selected the Annette Islands because of their fishing potential."). At the invitation of President Cleveland, the remainder of the 823 Metlakatlans followed on August 7, 1887. 21 Cong. Rec. 10092 (1890); Neylan, *supra*, at 199; Hosmer, *supra*, at 200; Nat'l Surv. of Hist. Sites & Bldgs., U.S. Dep't of the Interior & Nat'l Park Serv., *Alaska History: 1741-1910*, at 127, 209 (1961). Years later, reflecting on the migration, Metlakatlan Rod Davis recounted,

> When we landed in . . . Alaska, now, at the time it was a nice beautiful day. How well I remember that day; it was bright and sunny, and there was a lot of fish. We camped at one of the creeks on Saturday night . . . and in those days that creek was just loaded with salmon, pink salmon. There must have been millions of them in that creek. How well I remember.

Neylan, *supra*, at 211.

After moving to the Annette Islands, the Metlakatlans continued to fish throughout the waters of Southeast Alaska. *See* Hosmer, *supra*, at 200–01. In 1891, four years after the Metlakatlans moved to the islands, Congress passed the 1891 Act, recognizing the Metlakatlan Indian Community and establishing the Annette Islands as the Community's reservation. The Act, later codified as amended at 25 U.S.C. § 495, provided:

> That until otherwise provided by law the body of lands known as Annette Islands, situated in Alexander Archipelago in Southeastern Alaska, on the north side of Dixon's entrance, be . . . set apart as a reservation for the use of the Metlakahtla [sic] Indians, and those people known as Metlakahtlans [sic] who have recently emigrated from British Columbia to Alaska, and such other Alaskan natives as may join them, to be held and used by them in common, under such rules and regulations, and subject to such restrictions, as may [be] prescribed from time to time by the Secretary of the Interior.

Act of Mar. 3, 1891, ch. 561, § 15, 26 Stat. 1101 (1891).

After Congress established the reservation, Community members continued to fish where they had always fished, both in the waters immediately surrounding the reservation and in the waters miles away. Hosmer, *supra*, at 203, 205. Reports by federal agencies and federal officials documented Metlakatlans fishing up to 50 miles from the reservation. Jefferson F. Moser, U.S. Comm'n of Fish &

Fisheries, *The Salmon and Salmon Fisheries of Alaska: Report of the Operations of the United States Fish Commission Steamer Albatross for the Year Ending June 30, 1898*, at 63, 68 (1899) (identifying sites at Quadra Bay and Moira Sound); Jefferson Moser, U.S. Comm'n of Fish & Fisheries, *The Salmon and Salmon Fisheries of Alaska: Report of the Alaskan Salmon Investigations of the United States Fish Commission Steamer Albatross in 1900 and 1901*, at 298 (1902) (identifying sites at Home Stream, Tamgas, Quadra Bay, Karta Bay, Kithraum, Peter Johnson, Nowiskay, Old Johnson, Kegan, and Kagahine); George R. Tingle, Inspector of Salmon Fisheries, Special Agent Div., U.S. Treasury Dep't, *Report on the Salmon Fisheries in Alaska, 1896*, at 5, 21 (1897) (identifying sites at Naha Bay, Karta Bay, and Kah Shakes Cove); *see* Hosmer, *supra*, at 203 (concluding that these practices "provid[e] convincing evidence that they did not equate immigration with a relinquishing of their aboriginal resource rights"). Father Duncan's letters corroborate these reports, documenting Metlakatlan fishing throughout the southern Alaska panhandle.  Hosmer, *supra*, at 205.

Fishing at these off-reservation locations supplied a cannery that Metlakatlans established on the reservation in 1891.  This cannery replaced the cannery they had established at Metlakatla, British Columbia, before they moved to the Annette Islands.  Moser, *1900 and 1901*, *supra*, at 297–98; Hosmer, *supra*, at 201–02.  By 1900, the cannery had annual output of more than 17,000 cases of cans.  Moser, *1900 and 1901*, *supra*, at 298.  By 1912, total production reached nearly 300,000 cases.  Hosmer, *supra*, at 201.  Metlakatlans also continued to rely on fish for cultural practices, including feasts for observances of birth, marriage, death, and other important life transitions

entailing consuming, giving, and exchanging fish. According to Professor Hosmer, the Metlakatlans "successfully picked up and relocated, hardly missing a beat." *Id.* at 204.

In 1915, the Secretary of the Interior promulgated regulations establishing an elected Community council with authority to enact local ordinances for the reservation, and allowing Community members to obtain federal permits for the use of salmon traps in waters adjacent to the Annette Islands. *See Metlakatla Indian Cmty., Annette Islands Rsrv. v. Egan*, 369 U.S. 45, 48 (1962).

In 1916, President Wilson proclaimed that the waters 3,000 feet from the shoreline of the Annette Islands were reserved for the exclusive use of the Metlakatlans. The Proclamation provides:

> Now, therefore, I, Woodrow Wilson, President of the United States of America, by virtue of the power in me vested by the laws of the United States, do hereby make known and proclaim that the waters within three thousand feet from the shore lines at mean low tide of Annette Island, Ham Island, Walker Island, Lewis Island, Spire Island, Hemlock Island, and adjacent rocks and islets, located within the area segregated by the broken line upon the diagram hereto attached and made a part of this proclamation; also the bays of said islands, rocks, and islets, are hereby reserved for the benefit of the Metlakahtlans [sic] and such other Alaskan natives as have joined them or may join them in residence on these islands,

> to be used by them under the general
> fisheries laws and regulations of the United
> States as administered by the Secretary of
> Commerce.

Proclamation No. 1332, 39 Stat. 1777–78 (Apr. 28, 1916).

The Department of the Interior promulgated the Proclamation as a regulation at 25 C.F.R. § 241.2. The Community's cannery operations were thereafter organized under the aegis of the Annette Island Packing Company. *See Territory v. Annette Island Packing Co.*, 6 Alaska 585 (D. Alaska 1922), *aff'd*, 289 F. 671 (9th Cir. 1923), *cert. denied*, 263 U.S. 708 (1923).

In 1916, shortly before President Wilson issued the Proclamation, non-Indians had placed a fish trap 600 feet off the shore of the reservation. The United States brought suit in the district court for the Territory of Alaska, seeking an injunction that would require removal of the trap. The court granted the injunction. It wrote:

> In passing [the 1891 Act], Congress must be
> held to have known (what every one else
> knew) that the Indians of Alaska are fisher
> folk and hunters and trappers, and largely, if
> not entirely, dependent for their livelihood
> upon the yield of such vocations. It must be
> held to have known that without the food
> yield of the sea these Indians could not
> survive, for the Annette Islands would not of
> themselves, "as land," afford a subsistence
> for a community of souls; there being little
> or no agricultural land on the islands, or for
> that matter in all Southeastern Alaska.

*United States v. Alaska Pac. Fisheries*, 5 Alaska 484, 486–87 (D. Alaska 1916).

The Supreme Court affirmed.  In *Alaska Pacific Fisheries*, 248 U.S. at 89, the Court held that the 1891 Act establishing the reservation granted an exclusive right to Metlakatlans to fish in the "fishing grounds" "adjacent" to the Annette Islands.  The Court wrote:

> After their settlement and before the reservation was created, the Indians . . . adopted a form of self-government suited to their needs . . . and constructed and installed an extensive establishment where they canned salmon for the market.  The purpose of creating the reservation was to encourage, assist and protect the Indians in their effort to train themselves to habits of industry [and] become self-sustaining . . . .  Evidently Congress intended to conform its action to their situation and needs.

*Id.* at 88–89.  In affirming the injunction requiring the removal of the non-Indians' fish trap, the Supreme Court relied only on the 1891 Act.  It did not rely on, or even mention, the 3,000-foot boundary established by President Wilson's 1916 Proclamation.  *See also Egan*, 369 U.S. at 49 ("In 1918, without reference to the proclamation, this Court upheld the right of the Metlakatlans to exclude others from the waters surrounding their islands on the ground that these waters were included within the original reservation by Congress." (citing *Alaska Pacfic Fisheries v. United States*, 248 U.S. 78)).

After the Supreme Court's decision in *Alaska Pacific Fisheries*, Metlakatlans continued to fish in the off-reservation waters where they had always fished. An internal Department of the Interior report in 1920 recounted that "Metlakatla natives did, as they have from time immemorial, go beyond the [reservation's] limit[s] to seine fish." The Territory of Alaska acknowledged the geographical extent of the Metlakatlans' traditional fishing grounds in a tax dispute arising out of the Community's commercial fishing. In its answer to the Secretary of the Interior's complaint-in-intervention, Alaska wrote:

> [T]he right of the inhabitants of said Annette Island[s] reserve to catch fish outside of the reserve . . . has always been and is now recognized by the [Secretary of the Interior] and by the Government of the United States, and such right is and at all times has been claimed by the said Metlakatla people.

Answer to Complaint in Intervention, at 5, *Territory v. Annette Island Packing Co.,* 6 Alaska 585 (No. 2023-A). In deciding the tax dispute, the territorial court noted that fish for the Metlakatlan cannery were "secured from any waters" and that, in 1919, the cannery had processed "approximately 130,000 salmon caught by Indian residents of Metlakahtla [sic] outside of the Annette Indian reserve and its reserved waters." *Annette Island Packing Co.,* 6 Alaska at 592 (agreed statement of facts).

Congress granted statehood to Alaska in 1958. Pub. L. No. 85-508, § 6(e), 72 Stat. 339, 340 (1958). In 1972, Alaskans adopted a constitutional amendment that authorized the State to limit the entry of new participants

into commercial fisheries in Alaskan waters. Alaska Const. art. VIII, § 15. In 1973, pursuant to that amendment, Alaska instituted a "limited entry" program to regulate commercial fishing. Alaska Stat. § 16.43.010.

In recent years, changing conditions have threatened fish stocks available to the Community. Community members primarily fish for salmon. Migratory fish such as salmon are subject to changes in their migratory routes in response to environmental conditions, including climate change. Non-Indian commercial fishing practices in the State-managed fishing areas surrounding the Community's exclusive zone have put a substantial strain on Community fish yields. State-managed fisheries sometimes intercept salmon before they return to the Community's exclusive zone. Community members also fish for herring. The Community has adopted a management strategy that has increased the exclusive zone's herring biomass to more than 20,000 tons—one of the largest herring stocks in Southeast Alaska. However, when herring leave the exclusive zone, Alaska's limited entry program restricts access to the herring by Community members.

## II. Proceedings Below

On August 7, 2020, the Community sued Alaskan officials in federal district court, alleging that Alaska's limited entry program illegally restricts Community members' right to fish outside the reservation boundaries. The Community's complaint seeks (1) a declaration that "Congress' reservation of the Annette Islands Reserve for the Metlakatla Indian Community included the non-exclusive right to fish in waters adjacent to the Reserve currently designated as Districts 1 and 2, free from unreasonable interference by the defendants, and that such

right has not been revoked or diminished"; and (2) "a permanent injunction barring the defendants from asserting jurisdiction over the Community and its members inconsistent with the Community's reserved fishing rights, and from otherwise unreasonably interfering with the Community's reserved fishing rights."

Defendants moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6). The Community opposed the motion and requested oral argument. The district court denied the request for oral argument and granted the motion to dismiss. The court determined that the Community failed to state a claim for relief because, in the view of the court, the 1891 Act did not reserve off-reservation fishing rights for the Community and its members.

The Community timely appealed. For the reasons that follow, we reverse.

### III. Standard of Review

We review de novo a dismissal for failure to state a claim under Rule 12(b)(6). *United States v. Washington*, 853 F.3d 946, 961 (9th Cir. 2017). We review de novo questions of statutory interpretation. *Confederated Tribes of Chehalis Indian Rsrv. v. State of Washington*, 96 F.3d 334, 340 (9th Cir. 1996). We review for abuse of discretion a decision to grant or deny permanent injunctive relief, but we review de novo the underlying legal conclusions on which the district court based its decision. *United States v. Oregon*, 470 F.3d 809, 810 n.2 (9th Cir. 2006).

## IV.  Discussion

### A.  Indian Canon of Construction

Statutes that touch upon federal Indian law "are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.,* 951 F.3d 1142, 1156 (9th Cir. 2020) (quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985)); *Chehalis*, 96 F.3d at 340 ("Courts have uniformly held that treaties, statutes[,] and executive orders must be liberally construed in favor of establishing Indian rights."). Statutes that create reservations, like treaties and executive orders, "are interpreted as the Indians would have understood them." *Chehalis*, 96 F.3d at 342 (citing *Parravano v. Babbitt*, 70 F.3d 539, 544 (9th Cir. 1995), *cert. denied*, 518 U.S. 1016 (1996)); *Puyallup Indian Tribe v. Port of Tacoma,* 717 F.2d 1251, 1257 n.6 (9th Cir. 1983), *cert. denied*, 465 U.S. 1049 (1984) ("This principle of treaty construction applies with equal force to statutes passed for the benefit of Indians and to executive orders." (citations omitted)). A right will be inferred when that right supports a purpose for which a reservation was established. *Winters v. United States*, 207 U.S. 564, 576–77 (1908). Because the purposes of reservations are often unarticulated in a statute, treaty, or executive order, we consider "the circumstances surrounding their creation[] and the history of the Indians for whom they were created." *Chehalis*, 96 F.3d at 342 (citing *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 47 (9th Cir. 1981)), *cert. denied*, 454 U.S. 1092 (1981). "We also consider their need to maintain themselves under changed circumstances." *Colville*, 647 F.2d at 47. These interpretive principles "are rooted in the unique trust relationship between the United States and the Indians."

*Oneida Cnty. v. Oneida Indian Nation of New York State*, 470 U.S. 226, 247 (1985).

### B. Implied Off-Reservation Rights

The Indian canon requires us to infer rights that support a reservation's purpose. The seminal case is *Winters v. United States*, in which the Court found implied water rights that supported the purpose of the Fort Belknap Reservation. 207 U.S. at 576–77. The reservation had been created by an agreement between the United States and the Gros Ventre and Assiniboine Tribes. *Id.* at 565. The purpose of the reservation was to encourage the Tribes to give up their "nomadic" way of life and to become farmers. *Id.* at 576. No provision was made in the agreement for water to irrigate the arid land on the reservation. The Court chose "between two inferences[—]*one of which would support the purpose of the agreement* and the other impair or defeat it." *Id.* at 577 (emphasis added). The Court chose the former inference on the ground that the agreement creating the reservation should be construed to imply a right to water for irrigation in order not to "defeat the declared purpose" of the agreement. *Id.*

In *Arizona v. California*, 373 U.S. 546 (1963), the Court inferred a right to irrigation water from the Colorado River for five Indian reservations. One of the reservations had been created by statute; the other four had been created by executive order. *Id.* at 596. Citing *Winters*, the Court held that all five reservations had implied rights to water for irrigation. *Id.* at 599–600. The Court affirmed the Special Master, who had concluded "that the water was intended *to satisfy the future as well as the present needs* of the Indian Reservations and ruled that enough water was reserved to irrigate all of the practicably irrigable acreage

on the reservations." *Id.* (emphasis added); *see also United States v. New Mexico*, 438 U.S. 696, 702 (1978) ("Where water is necessary to fulfill the very purposes for which a federal reservation was created, it is reasonable to conclude, even in the face of Congress' express deference to state water law in other areas, that the United States intended to reserve the necessary water.").

We have applied the *Winters* implied-rights rule in several cases in this circuit. In *Colville*, 647 F.2d at 45, an agreement between the United States and the tribes established a reservation in eastern Washington. We construed the purposes of the reservation broadly: "The specific purposes of an Indian reservation . . . were often unarticulated. The general purpose, to provide a home for the Indians, is a broad one and must be liberally construed." *Id.* at 47 (footnotes omitted). We wrote: "Congress intended to deal fairly with the Indians by reserving waters without which their lands would be useless." *Id.* We held that there was an implied right not only to water for irrigation, but also to water for streams for spawning trout. We wrote:

> Providing for a land-based agrarian society, however, was not the only purpose for creating the reservation. The Colvilles traditionally fished for both salmon and trout. Like other Pacific Northwest Indians, fishing was of economic and religious importance to them. . . . The Tribe's principal historic fishing grounds on the Columbia River have been destroyed by dams. The Indians have established replacement fishing grounds in Omak Lake

> by planting a non-indigenous trout. . . .
> [P]reservation of the tribe's access to fishing
> grounds was one purpose for the creation of
> the Colville reservation. Under the
> circumstances, we find an implied
> reservation of water . . . for the development
> and maintenance of replacement fishing
> grounds.

*Id.* at 48 (citations omitted).

In *United States v. Adair*, 723 F.2d 1394, 1397–98 (9th Cir. 1983), a treaty established a reservation for the Klamath Tribe in eastern Oregon. The treaty promised that the Tribe would have the right to "hunt, fish, and gather on their reservation," *id.* at 1398, but did not mention any right to water. A purpose of the reservation was to "secure to the Tribe a continuation of its traditional hunting and fishing" way of life. *Id.* at 1409. Because game and fish on the reservation depended on a continuous flow of water from the Williamson River, we held that there was an implied right under the treaty to an amount of river water that would ensure an adequate amount of game and fish for the Tribe. *Id.* at 1411; *see also Washington*, 853 F.3d at 965 ("[E]ven if Governor Stevens had made no explicit promise, we would infer . . . a promise to 'support the purpose' of the Treaties. . . . [T]he Tribes' right of access to their usual and accustomed fishing places would be worthless without harvestable fish.").

Our sister circuit endorsed the application of the *Winters* framework to the context of off-reservation fishing rights in *United States v. Michigan*, 653 F.2d 277 (6th Cir. 1981). The Sixth Circuit affirmed the district court's holding that a treaty reserved for the Sault Ste. Marie Tribe

of Chippewa Indians of Michigan and Bay Mills Indian Community implied non-exclusive fishing rights in certain areas of the Great Lakes. *United States v. Michigan*, 471 F. Supp. 192, 253, 258 (W.D. Mich. 1979), *aff'd*, 653 F.2d 277. The district court concluded that the historical evidence "demonstrat[ed] that the Indians were absolutely dependent upon fishing for subsistence and their livelihood" such that "they would not have relinquished their right to fish in the ceded waters of the Great Lakes." *Id.* at 253. Applying *Winters*, the district court held that the treaty "impliedly reserved a right to fish commercially and for subsistence" in those areas of the Great Lakes because (1) the treaty lacked "language expressly relinquishing the aboriginal right of the . . . Indians to fish in the . . . waters"; (2) at the time of the treaty, "commercial fishing was essential to the livelihood of these Indians and for them to have relinquished fishing rights would have been tantamount to agreeing to a systematic annihilation of their culture, and perhaps of their very existence"; (3) the tribes and the federal government "were aware that the Indians had no way of sustaining themselves in Michigan except by fishing"; and (4) "the Indians did not understand the treaty to limit their right to fish." *Id.* at 257–58.

C. The Community's Off-Reservation Fishing Right

The question before us is not the existence of implied fishing rights of the Community. In *Alaska Pacific Fisheries*, 248 U.S. at 88–89, the Supreme Court answered this threshold question when it inferred a fishing right from the 1891 Act, relying on that right to affirm an injunction against a non-Indian fish trap 600 feet from the shore of the Community's reservation. We thus know from *Alaska Pacific Fisheries* that there is an implied fishing right stemming from the 1891 Act. The question before us is the

scope of that right. A central purpose of the reservation, understood in light of the history of the Community, provides the answer.

As described above, since time immemorial Metlakatlans have fished outside the boundaries of their current reservation. Before the arrival of European settlers, they fished throughout the waters of Southeast Alaska for ceremonial purposes, for personal consumption, and for trade. Shortly before they came to the Annette Islands, Metlakatlans established a commercial fish cannery to adapt their mode of trade to modern conditions. When Metlakatlans moved to the islands in the late 1880s at the invitation of President Cleveland, they did so with the understanding that they would be able to support themselves by fishing, as they had always done. Indeed, soon after moving to the reservation, the Community set up a new cannery—supplied by off-reservation fishing—and quickly increased production in the following years. When Congress passed the 1891 Act establishing the Metlakatlans' reservation, it did so with the expectation that the Metlakatlans would continue to support themselves by fishing. *Id.* at 89 ("The purpose of creating the reservation was to encourage, assist[,] and protect the Indians in their effort to . . . become self-sustaining . . . . Without [fishing rights] the [Community] could not prosper."). That is, Congress passed the Act with the expectation not only that Metlakatlans would catch fish for ceremonial purposes and personal consumption, but that they would also pursue the commercial fishery that had provided, and continued to provide, essential economic support for the Community. Congress clearly contemplated that Metlakatlans would continue to fish off-reservation toward those ends. Congress also expected fishing to

support the Community not only at the time the reservation was created, but in the future.  In the words of the Supreme Court in *Arizona v. California,* fishing "was intended to satisfy the future as well as the present needs" of the Community.   373 U.S. at 600; *see also Alaska Pac. Fisheries*, 248 U.S. at 89 ("Congress intended to conform its action to their situation and needs.").

We therefore hold that the 1891 Act preserved for the Community and its members an implied right to non-exclusive off-reservation fishing in the traditional fishing grounds for personal consumption and ceremonial purposes, as well as for commercial purposes.  Because this case comes to us on appeal from a ruling on a Rule 12(b)(6) motion, we remand to the district court to allow further proceedings to determine whether the Community's traditional off-reservation fishing grounds included the waters within Alaska's Districts 1 and 2.

## D.  Arguments Made by Alaska

Alaska argues that distinguishing features of the Community's reservation require us to analyze the Metlakatlans' right differently from the rights of members of other tribes.  Alaska presented a substantially similar argument to the Supreme Court over sixty years ago in *Egan.*   There, Alaska argued: "The nature of the Metlakatlan 'reservation' cannot be too strongly emphasized.  It is not, and has never been treated as what is normally termed an Indian reservation. . . .   It is only necessary to . . . apply relevant legal theory—not theories which may be applicable to Indian reservations elsewhere, set up under different terms, and given different historical treatment."   Brief for Appellees at 44–45, *Metlakatla Indian Cmty. v. Egan*, 369 U.S. 45 (1961) (No. 2).  The

Court declined to ascribe analytical significance to the different set of circumstances surrounding the creation of the Community's reservation, and so do we.

Here, Alaska first asks us to distinguish between statutes and executive orders, contending that an implied right should not be found in a statute, such as the 1891 Act, whose text is "utterly silent" about such a right. The distinction Alaska asks us to draw does not exist in the case law. As Professor Phil Frickey observed:

> [M]any federal Indian law decisions, especially those dealing with developments since the mid-nineteenth century, turn not on treaty language, but on the text of seemingly more mundane instruments of law, such as statutes, executive orders, and federal regulations. For example, millions of acres of Indian lands are located on reservations established by executive order. This difference in form should not, however, substantially alter judicial methodology. Some of these non-treaty enactments embody agreements with tribes that would have been handled by treaty in former eras. Many of the rest embody unilateral alterations of prior treaties. In any event, because all are constitutive in nature—all adjust a sovereign-to-sovereign, structural relationship based on Chief Justice Marshall's understanding of the earliest colonial practices prior to the negotiation of any treaty—the canon should apply to them, too. Consistent with this notion, the Court

> has drawn no fundamental interpretive distinction between reservations established by statute or executive order and those protected by treaty.

Philip P. Frickey, *Marshalling Past and Present: Colonialism, Constitutionalism, and Interpretation in Federal Indian Law*, 107 Harv. L. Rev. 381, 421–22 (1993) (footnotes omitted); *see also* James T. Campbell, Aurelius*'s Article III Revisionism: Reimagining Judicial Engagement with the* Insular Cases *and "The Law of the Territories"*, 131 Yale L. J. 2542, 2637 (2022) ("The Court has declined to distinguish between treaty and nontreaty agreements with the federal government, subjecting both to interpretive rules that are designed to vindicate those promises . . . . That interpretive approach flows from a meaningful interrogation of historical practice . . . ." (footnotes omitted)).

The case law reflects this principle. The Court in *Arizona v. California* dealt with implied rights to water for tribes on five reservations. 373 U.S. at 596. One of the reservations was created by statute; the others were created by executive order. The Court drew no distinction between the two types of legal instruments. *See id.* at 598–600. In *Puyallup Indian Tribe*, 717 F.2d at 1257 n.6, we wrote that the Indian canon, while often applied to treaties as a matter of historical coincidence, also "applies with equal force to statutes passed for the benefit of Indians and to executive orders." Later, in *Parravano*, 70 F.3d at 544, we wrote that "[t]he rule of construction applicable to executive orders creating Indian reservations is the same as that governing the interpretation of Indian treaties." And in *Chehalis*, 96

F.3d at 340, we recognized that the Indian canon applies "uniformly" to "treaties, statutes[,] and executive orders."

The type of legal instrument that establishes a reservation thus makes no difference to our inquiry into a tribe's attendant resource rights. Because the Indian canon is rooted in the trust relationship between the federal government and Indian tribes, *see Oneida Indian Nation*, 470 U.S. at 247, and because federal recognition of an Indian tribe institutionalizes that relationship, *see* Cohen's Handbook of Federal Indian Law § 3.02[3] (Nell Jessup Newton ed., 2017), it does not matter which type of document provides such recognition or establishes a reservation. *See also Seminole Nation v. United States*, 316 U.S. 286, 296–97 (1942).

Second, Alaska argues that the Community is foreclosed from claiming an implied right to off-reservation fishing because Metlakatlans "had no aboriginal claims to preserve." However, as discussed above, Metlakatlans and their Tsimshian ancestors asserted and exercised a right to fish in these waters since time immemorial. In passing the 1891 Act, Congress "confirmed the continued existence of th[is] right[]." *Adair*, 723 F.2d at 1414.

Third, Alaska asks us to distinguish between the Community and tribes that were forced off of all or part of their original lands, where those tribes gave up their original lands in exchange for explicit and/or implicit appurtenant off-reservation rights. In the view of Alaska, because the United States provided the Annette Islands to the Community as a gift rather than pursuant to an exchange, the United States did not intend the 1891 Act to provide any implicit off-reservation rights.

There is nothing in the case law indicating that implied rights are only found in instances where there has been an exchange.  Indeed, it is difficult to characterize the creation of many reservations as resulting from any sort of genuine "exchange."  *See Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631 (1970) (observing that these legal arrangements were often "imposed upon [the Indians] and they had no choice but to consent"); *Hagen v. Utah*, 510 U.S. 399, 422 n.1 (1994) (Blackmun, J., dissenting) (noting the "unequal bargaining power when agreements were negotiated").  The Supreme Court has recently emphasized, "[I]n order to create a reservation it is not necessary that there should be a formal cession or a formal act setting apart a particular tract.  It is enough that from what has been there results a certain defined tract appropriated to certain purposes." *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2475 (2020) (alteration in original) (quoting *Minnesota v. Hitchcock*, 185 U.S. 373, 390 (1902)).  As the Supreme Court wrote in *Egan*, 369 U.S. at 52, "The words 'set apart as a reservation,' appearing in the statute creating the Annette Islands Reserve, are substantially the same as used in numerous other statutory reservations."  The Court noted that reservations secured by other legal instruments, such as treaties, are "sometimes phrased in terms of a gift or assignment rather than a reservation of land."  *Id.*

Fourth, Alaska argues that the legislative history of the 1891 Act "demonstrates a lack of intent to convey off-reservation fishing rights."  Alaska argues:

> The Senate's understanding of the Metlakatlans' history was "well-known." The Senate understood that Father Duncan sought Congress's "consent" to allow these

> *immigrants* to continue to live on the Annette Islands. And Congress gave that consent after considering that the Metlakatlans had formed what senators believed was a *model Christian community*. . . . The congressional record says nothing about fishing rights, much less some sort of prioritized off-reservation fishing rights for the Metlakatlans.

(emphases added). Neither the fact that the Metlakatlans were "immigrants," nor the fact that they had formed what the Senators believed was a "model Christian community" is relevant to the question whether Congress expected the Metlakatlans to support themselves through off-reservation fishing. The Metlakatlans did, in fact, immigrate to the Annette Islands from British Columbia, but the Supreme Court has told us that this is legally irrelevant. The Court wrote in *Alaska Pacific Fisheries*: "True, the Metlakahtlans [sic] were foreign born, but the action of Congress has made that immaterial here." 248 U.S. at 89. Further, the Senate's understanding of the religious beliefs of Community members tells us nothing about the means by which Congress expected them to support themselves.

## E. Regulation

Alaska's limited entry program, as currently administered, is incompatible with the Metlakatlans' off-reservation fishing rights. Fishing had always been, and continues to be, the heartbeat of the Community. Congress' intent in the 1891 Act was that the Metlakatlans would have off-reservation fishing rights that would "satisfy the future as well as the present needs" of the Community. *Arizona*, 373 U.S. at 600. Any regulation by

Alaska of off-reservation fishing by the Community must be consistent with such rights.

### Conclusion

We hold that the 1891 Act reserves for the Metlakatlan Indian Community an implied right to non-exclusive off-reservation fishing in the areas where they have fished since time immemorial and where they continued to fish in 1891 when their reservation was established. We reverse the decision of the district court and remand for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**